No. 461 July 3, 2024 569

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

CREEKSIDE VALLEY FARMS, LLC,
and Paul H. KUEHENE,
*Petitioners,*

*v.*

DEPARTMENT OF AGRICULTURE,
*Respondent.*

Oregon Department of Agriculture
190723; A177927

Argued October 25, 2023.

Richard P. Brown argued the cause for petitioners. Also on the briefs were John T. Bridges and Brown, Tarlow, Bridges, & Palmer, PC.

Robert Koch, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Reversed and remanded.

Pagán, J., dissenting.

**MOONEY, J.**

Petitioners seek review of a final order of the Oregon Department of Agriculture (the department) imposing civil penalties for multiple violations of ORS 634.372(4), which provides, in part, that "[a] person may not: \*\*\* [p]erform pesticide application activities in a faulty, careless or negligent manner." They raise eight assignments of error, all of which essentially challenge the department's conclusion that each petitioner committed eight separate pesticide violations. We conclude that the department's interpretation of its rule defining what constitutes a violation is plausible. We conclude, however, that substantial evidence and reason do not support the department's conclusion that petitioners made eight separate decisions to apply pesticide to eight separately managed radish fields, resulting in eight separate acts constituting eight statutory violations. We therefore reverse and remand.

## FACTS AND PROCEDURAL HISTORY

The relevant facts are undisputed. Petitioners are Creekside Valley Farms, LLC (an agricultural operation and leaseholder of the subject property) and Paul Kuehne, Creekside's sole member and registered agent. Kuehne is licensed by the department as a Private Pesticide Applicator, and Creekside is licensed as a Commercial Pesticide Operator. The agricultural property at the heart of this matter consists of 461 acres which, in 2019, were dedicated to the cultivation of radish crops for purposes other than human consumption. Petitioners do not dispute that the pesticide, Witness Herbicide, was applied to the radish crops on May 9, 2019, and again on May 27, 2019, at Kuehne's direction. They agree that those applications violated ORS 634.372(4).

The department investigated the use of Witness Herbicide on the farm after receiving a formal complaint. It obtained and executed an administrative search warrant that authorized the department to take field samples in connection with its investigation. In anticipation of the sampling, the lead investigator, Odenthal, reviewed arial maps of the property that he obtained from Google Earth.

He identified and marked the perimeter of the farm on one such map with a blue line, and he used yellow lines to identify what he characterized as eight separate fields within that perimeter. The map that he completed, shown below, identified the fields as:

NW Corner    28 acre

Circle 1    100 acres

N Center    18 acres

Circle 2    170 acres

SE    32 acres

NE    7 acres

East    23 acres

Circle 3    83 acres



Exhibit A40

Following an administrative contested case hearing, an ALJ issued two proposed orders,[1] concluding that, by

---

[1] One order pertained to Creekside and the other to Kuehne. The orders contain minor variations in referring to Creekside (through its employees) applying the herbicide versus Kuehne ordering and supervising the application, and some details specific to Kuehne's knowledge as a private pesticide applicator. The orders are identical in all ways relating to the issues presented in this petition for review.

applying Witness Herbicide to the radish fields, Creekside and Kuehne had each committed eight violations of ORS 634.372(4). The proposed orders noted that "because the eight separate radish fields were managed separately, each act of applying Witness pesticide to each separate field is considered a separate act and therefore a separate violation under OAR 603-057-0500(11)." Petitioners were assessed a $10,000 fine for each violation, resulting in an $80,000 fine each for Creekside and Kuehne. Petitioners filed exceptions, and the Director of the department issued final orders that deleted text from the proposed orders relating to the definition of a "field," but otherwise adopted the proposed orders. This petition for judicial review followed.

## STANDARD OF REVIEW

We review the department's order in this contested case for substantial evidence, abuse of discretion, and errors of law. ORS 183.482(8). Our decision turns on the requirement of substantial evidence, focusing in particular on that requirement's component of substantial reason. As the Supreme Court recently explained:

> "Implicit in the requirement that orders be supported by substantial evidence is an additional requirement that they be supported by substantial reason. An order is supported by substantial reason when it articulates a rational connection between the facts and the legal conclusions it draws from them. Among other purposes, the substantial-reason requirement ensures meaningful judicial review."

*SAIF v. Coria*, 371 Or 1, 12, 528 P3d 785 (2023) (internal quotation marks and citations omitted). Meaningful review requires us to do more than simply verify that the department gave an explanation for its conclusions. Meaningful review requires us to read the content of the explanation to ensure that it supplies the required "rational connection between the facts and the legal conclusions it draws from them." *Id.*

## ANALYSIS

In evaluating whether the department lawfully assessed eight pesticide violations against each petitioner, we begin with the department's interpretation of what constitutes a violation. OAR 603-057-0500(11) defines

"violation" as "an act or omission" that "does not comply with a provision of ORS chapter 634 that relates to pesticide application, sale, or labeling[.]" In the final orders, the department noted that "the key to determining how many violations occurred is determining how many distinct acts or omissions occurred." In summarizing the way the department makes that determination, the final order stated:

> "Department staff testified that, when a pesticide is applied unlawfully to fields that are in commercial agricultural production, the Department treats each unlawful pesticide application to a distinguishable field as a separate violation. Department staff further testified that, in attempting to determine how many separate fields exist at a given site, the Department evaluates any physical barriers that separate the fields, and whether the fields are managed separately or as a single unit. If a person is making separate decisions about how to grow crops in different areas, then the person is committing a separate 'act'—and, therefore, a separate violation—each time the person decides to unlawfully apply a pesticide to a given area (in this case, to a given field). That determination is made by examining whether, as a factual matter, the areas in question have any physical divisions, and whether they are managed separately or as a single unit."

We defer to an agency's plausible interpretation of its own rule, including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law. *Papas v. OLCC*, 213 Or App 369, 377, 161 P3d 948 (2007). "Act or omission" is not defined in ORS chapter 634 or the relevant administrative rules. The dictionary defines an "act" as "a thing done or being done." *Webster's Third New Int'l Dictionary* 20 (unabridged ed 2002). The department's interpretation of "act" as including each decision to apply pesticides to separate fields is a plausible interpretation of the term and is consistent with the State Pesticide Control Act's purpose of regulating the application and use of pesticides in the public interest. ORS 634.005.

In assessing the number of fields involved, the department's policy is to consider (1) physical characteristics of the property such as roads, fences and other barriers, irrigation

systems, and crop heights, and (2) whether the property is managed as separate fields or as a unified piece of property. It is certainly plausible to think that different physical characteristics of the property might make it necessary to make different decisions about whether and how to apply pesticide to different parts of the property because of those characteristics. The second inquiry of the department's policy—considering how the property is actually managed—provides additional information that, in conjunction with information about the physical characteristics of the property, provides a plausible way of determining how many decisions were made that resulted in separate acts, each of which violated ORS 634.372(4). We conclude that the department reasonably interpreted its rule and that its interpretation merits our deference.

We turn to the department's application of its rule in this case to conclude that petitioners separately managed the acreage as eight separate agricultural fields and that they made eight separate decisions that resulted in eight separate pesticide applications in violation of the law. As noted above, we review findings of fact for substantial evidence and the application of the law to the facts for substantial reason. "Substantial evidence supports a finding when the record, viewed as a whole, permits a reasonable person to make the finding." *Gage v. Fred Meyer Stores - Kroger Co.*, 329 Or App 360, 362, 540 P3d 592 (2023), *adh'd to on recons*, 330 Or App 669, ___ P3d ___ (2024).

The final order noted a number of factors that were considered in determining that the farm was comprised of eight separately managed fields, including: manmade and natural barriers, including farm roads, a line of trees, and a slough with water; crop growth height; and the use of center pivot versus big gun irrigation systems. The findings of fact with respect to the presence of those features are supported by substantial evidence, particularly the photographs and the testimony of department investigators about their observations of the property. The department specifically relied on the following observations made by Odenthal in concluding that the acreage was divided into and separately managed as eight radish fields:

> "Circle 1 and NW Corner fields - The Circle 1 field was separated from the NW Corner field by a road and field growth around the edge. The Circle 1 field was irrigated with a center pivot irrigation system. The NW Corner field was irrigated with a big gun irrigation system.

> "NW Corner and N Center fields - The NW Corner field was separated from the N Center field by trees and a slough with water in it.

> "Circle 2, NE, and N Center fields - The Circle 2 field was irrigated with a center pivot irrigation system. The NE and N Center fields were triangular shaped. The NE and N Center fields were irrigated with a big gun irrigation system. The Circle 2 field was separated from the NE and N Center fields by the edge of the circle pattern where the center pivot irrigation ended.

> "The SE and Circle 2 fields - The SE field was separated from the Circle 2 field by a road and trees. The Circle 2 field was irrigated with a center pivot irrigation system. The SE field was irrigated with a big gun irrigation system.

> "The Circle 3 and East fields - The Circle 3 field was irrigated with a center pivot irrigation system. The East field was irrigated with a big gun irrigation system. The crop growth in Circle 3 was higher than the crop growth in the East field. The Circle 3 field was separated from the East field by the edge of the circle pattern where the center pivot irrigation ended."

(Footnotes omitted). We cannot say that the department's description of the physical characteristics of the property and irrigation systems is not supported by substantial evidence in the record. And for our purposes here, we assume the descriptions to be true, as far as they go. But we reject the notion that each constellation of characteristics described above and attributed to certain areas within the acreage supports the department's conclusion that those areas are separately managed and that, therefore, the decision to apply pesticide to each area was separately made and executed.

The problem with the department's analysis is twofold. First, the physical characteristics and layout of the acreage does not provide evidence of the decision or decisions that petitioners made about applying pesticide to the crops in May 2019. The argument that the layout of the farm

requires it to be managed as eight separate fields and that, therefore, eight decisions and eight pesticide applications were necessarily made in May 2019 assumes too much. The department did not explain how the presence of multiple watering systems, providing water to a contiguous, irregularly shaped farm, led it to conclude that areas within the farm were separately managed. The final order identified no evidence that the different types of irrigation equipment were independently used to achieve separate goals or that separate decisions were made about when or how much to irrigate different sections of the acreage. The evidence certainly supports an inference that petitioners use different types of irrigation equipment to deliver water to the acreage, but that does not lead to a nonspeculative conclusion about how petitioners decided to, or did, apply pesticide in May 2019. This is particularly notable with respect to the distinction between Circle 2 and the NE and N fields where the use of different irrigation systems was the only factor identified by the department as separating them. Indeed, soil and plant samples from those three areas were combined together in the testing process, returning one result for what the department characterized as three separate fields.

Without engaging in the additional inquiry about what decisions were actually made and how the property was managed, the department assumed the thing that required proof by substantial evidence—that eight decisions were made, resulting in eight acts of applying the prohibited pesticide and, thus, eight statutory violations. And the fact that the ALJ did not believe Kuehne's testimony that the acreage was managed as a single unit does not supply evidence that there were eight decisions to apply pesticide to eight separate sections of the farm.

The second problem with the department's analysis is that, even if physical characteristics alone were sufficient evidence of the human decisions to apply pesticide, when the record is considered as a whole, the department's application of its rule and policy to the farmland in question was inherently inconsistent and failed to otherwise rationally support its conclusion that there were eight separate statutory violations. There are inconsistencies in the department's use of

topography in different ways at different points across the acreage with no explanation for why it did so. For example, the department used a row of trees to justify treating the NW field as separate from the N Center field, and yet it did not use the very same line of trees that extended into and across Circle 2 to divide that circle into separate fields.[2] Similarly, the presence of farming roads in some locations was used to support the conclusion that fields were separate, but other roads through other areas were not mentioned at all. This disparate treatment renders the decision to find eight violations unsupported by substantial reason.

The most that can be said is that certain physical characteristics of the acreage and irrigation equipment appeared to the investigator to reflect eight areas or fields. But attributing different significance to the same line of trees and slough without explanation for that disparate treatment does no more to explain the department's conclusion that petitioners made eight separate decisions to apply pesticide than the fact that they use different irrigation equipment to deliver water to the various reaches of the acreage.

The defining characteristics that the department identified in finding eight separate areas do not support a finding of eight acts or omissions. The department did not supply a rational connection between the facts on which it relied and its legal conclusion that there were eight separate violations. We therefore reverse and remand.[3]

Reversed and remanded.

**PAGÁN, J.,** dissenting.

Petitioners admitted to intentionally using illegal pesticide on over 400 acres of farmland. Having no defense to the allegation of misuse, the only issue petitioners contested

---

[2] The department asserts in its answering brief that the tree line through Circle 2 was not sufficient to outweigh the irrigation evidence; however, the final order did not rely on that rationale, and it did not acknowledge the continuation of the slough and tree line.

[3] We are not persuaded by petitioners' assertion that the department's approach to tallying violations deprived petitioners of fair notice of how many violations they were exposed to, thus violating their right to due process. Petitioners had notice of what activity was prohibited (the unlawful use of pesticides) and had the opportunity to be heard on the issue of their violation. *Sachdev v. Oregon Medical Board*, 312 Or App 392, 402, 494 P3d 1018, *rev den*, 368 Or 637 (2021).

was how many violations occurred on that large swath of farmland. The Department of Agriculture provided an expert to testify on the issue. That expert visited the farmland, spoke with witnesses, looked at the equipment used on all the fields, and then applied the department's internal guidelines for discerning how many violations occurred. That expert concluded that there were eight fields, primarily because each one of those fields had its own irrigation management system, and the fields tended to be separated by either man-made or natural barriers. To rebut that expert, petitioners offered their own witnesses from the farm, who testified simply that there was only one field, despite the barriers and separate irrigation systems. The ALJ hearing these witnesses decided that the expert was more credible. The department then adopted that ALJ's findings and explained that it used the ALJ's credibility finding to support its decision to find eight separate violations. Thus, in my view, the department's decision is supported by substantial evidence, and having explained how that evidence allowed it to find eight violations, is supported by substantial reason. *Jenkins v. Board of Parole*, 356 Or 186, 195-96, 335 P3d 828 (2014). To the extent the majority concludes either that the department failed to provide substantial reasoning for its conclusions, or that the case law on our standard of review requires the department to do more than provide a rationale for its reasoning, I dissent.

　　Our appellate courts are sending mixed messages when reviewing a state agency's decision under ORS 183.482(8). On the one hand, "[o]ur review for substantial evidence [under ORS 183.482(8)] does not entail or permit the reviewing tribunal to reweigh or to assess the credibility of the evidence that was presented to the factfinding body." *WaterWatch of Oregon v. Water Resources Dept.*, 324 Or App 362, 384, 527 P3d 1, *rev den*, 371 Or 332 (2023) (citations and internal quotation marks omitted). "In other words, to the extent that the substantial reason requirement inheres in an agency's duty to make findings of fact and conclusions of law, the substantial reason requirement concerns the *reviewability* of the agency's orders." *Jenkins*, 356 Or at 195-96 (emphasis added). Focusing on reviewability provides a

particular heft to the deference we give to the agency. Or, as the Supreme Court stated before *Jenkins*:

> "On judicial review, the court will not substitute its judgment for that of the agency in drawing an inference, but the court must be satisfied that agency judgment has actually been exercised. Sometimes a rational nexus between an evidenced fact and an inference drawn from it is obvious from common experience (*e.g.*, we may infer from the fact of a wet street that it recently rained). In other cases, however, and particularly in cases involving expertise, the reasoning is not obvious (*e.g.*, we may infer from present meteorological conditions that it will snow tomorrow). In such an inference, we will not assume the existence of a rationale. Rather, we look to the order to state the rational basis of the agency's inference. The explanation need not be complex, but it should be sufficient to demonstrate the existence of a rational basis and to allow for judicial review."

*City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 271-72, 639 P2d 90 (1981) (footnote and citations omitted).

On the other hand, we have interpreted ORS 183.482(8) to require that the agency explain or justify what may be considered "inherent inconsistencies." *See, e.g.*, *SAIF v. Coria*, 371 Or 1, 14, 528 P3d 785 (2023) (remanding agency decision because the order failed to address inconsistencies); *The Boeing Company v. Cole*, 194 Or App 120, 123-24, 93 P3d 824 (2004) (explaining that "when there are inconsistencies in an expert's testimony, the board must provide an explanation as to the basis for its reliance on that testimony").

The two positions are plainly inconsistent. Either we are deferential and looking only to see that the agency explained its rationale sufficient for review, or we are reviewing the agency's decision for its persuasive weight. For me, the tension is relieved by adhering to the deference, examining whether the agency explained its reasoning, and ensuring that the agency in fact exercised its discretion.

Here, instead, the majority would have required the department to provide in its final order an explanation of "inherent inconsistencies" in the expert's testimony, such as why a row of trees was used to separate one field but may not have been for another. In my view, such an inquiry

necessarily oversteps the limitations of our review and spurns the deference we are supposed to provide agencies. The ALJ was presented with two evidentiary presentations on the issue of how many fields existed and was required to make a credibility finding. Following that finding, the department explained why the expert was more credible, explained how the expert used internal guidelines to make their conclusions, and why those conclusions would justify imposing a violation for each field separately under the appropriate regulations. That is all that is needed under ORS 183.482(8) for us to determine that the "agency judgment has actually been exercised." *Jenkins*, 356 Or at 196 (quoting *Roseburg*, 292 Or at 271).

Finally, to the extent the majority believes that the explanation is not sufficient under ORS 183.482(8), the only remedy is to send it back to the department to provide a full explanation for its reasoning. *See id.* at 195 ("If an agency order that is subject to ORS 183.470(2) does not contain [substantial reasoning], then the appellate court will reverse and remand the order for the agency to correct the deficiency."); *Coria,* 371 Or at 14 ("Therefore *** we remand the case to the board to explain its reasoning.").

I would conclude that the department's decision is supported by substantial evidence and substantial reasoning and would affirm.